**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Christopher Robert Beaulieu,
    Plaintiff

    v.                            Case No. 14-cv-280-SM
                                   Opinion No. 2016 DNH 171
John P. Aulis, Aaron M. Belanger,
Edward P. Kirrane, Dominic M. Salce,
Michael Shepley, Paul Laflamme,
Kevin Washburn, Jason Whitney,
Scott Collier, and Rueben James Ruiter,
    Defendants


**O R D E R**


Plaintiff, Christopher (Crystal) Beaulieu, is an inmate at the New Hampshire State Prison ("NHSP"). She has sued eight corrections officers and two inmates, asserting claims arising from three incidents in which Beaulieu alleges she was assaulted.[1] Before the court is a motion for summary judgment filed by the eight NHSP corrections officers who are named as defendants.[2] Plaintiff objects.

---

[1] Beaulieu has notified the court that she prefers the use of female pronouns in reference to her. Beaulieu identifies as transsexual, and the court will defer to her pronoun preference in this Order.

[2] The two inmate defendants, Scott Collier and Rueben Ruiter, have not appeared. Defaults have been entered against both. See Doc. Nos. 50 and 57.

### Summary Judgment Standard

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if it can be resolved in favor of either party, and a fact is 'material' if it has the potential of affecting the outcome of the case." Xiaoyan Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016)(internal quotation marks and citations omitted); see also Commodity Futures Trading Comm'n v. JBW Capital, LLC, 812 F.3d 98, 105 (1st Cir. 2016) ("the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." (emphasis in original) (citation and internal punctuation omitted)). At the summary judgment stage, the court draws "all reasonable inferences in favor of the non-moving party, but disregard[s] conclusory allegations, improbable inferences, and unsupported speculation." Fanning v. Fed. Trade Comm'n, 821 F.3d 164, 170 (1st Cir. 2016) (citation and internal punctuation omitted).

"A party moving for summary judgment must identify for the district court the portions of the record that show the absence

of any genuine issue of material fact." Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016)  Once the moving party makes the required showing, "the burden shifts to the nonmoving party, who must, with respect to each issue on which [it] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [its] favor." Id. (citation and internal punctuation omitted).  "This demonstration must be accomplished by reference to materials of evidentiary quality, and that evidence must be more than 'merely colorable.'" Id. (citations omitted).  The nonmoving party's failure to make the requisite showing "entitles the moving party to summary judgment." Id.


## Background

I.   January 2012 Incident

On January 19, 2012, Beaulieu was housed on C-tier, in the NHSP Special Housing Unit ("SHU").  Decl. of Christopher (Crystal) Beaulieu, Aug. 2, 2016 (doc. no. 87) ("Beaulieu Decl."), at 1.  NHSP Corrections Officer ("CO") Kevin Washburn and CO Jason Whitney were on duty in the SHU control room and they were responsible for operating the control panels that are used to remotely open and close SHU cell doors.  Id.; Statement of Jason Whitney, Jan. 26, 2012 (doc. no. 59-15) ("Whitney

Statement"), at 16.  NHSP Chef Paul Laflamme was also in the SHU
control room at that time, socializing with Washburn.  Aff. of
Jason Whitney, Dec. 9, 2015 (doc. no. 59-7) ("Whitney Aff.") at
para. 8; Beaulieu Decl. at 1; Statement of Kevin Washburn, Jan.
25, 2012 (doc. no. 59-15) ("Washburn Statement"), at 15.

After returning from a state court hearing, Beaulieu was
being escorted by CO Michael Shepley back to her cell.  Officers
Washburn and Whitney were on duty in the control room.  (First)
Aff. of Christopher (Crystal) Beaulieu, Aug. 2, 2016 (doc. no.
87-1) ("Beaulieu Aff. #1"), at para. 2.  As Shepley and Beaulieu
approached the C-tier entrance, Beaulieu saw inmate Rueben
Ruiter outside of his cell on the tier.  Beaulieu Decl. at 1.
Ruiter was a "tier worker," whose cleaning duties involved being
outside of his cell in the tier corridor at times.  Beaulieu
asked Shepley to have Ruiter locked up before they entered the
tier and it is undisputed that Shepley radioed the control room
to have Ruiter returned to his cell.  Id.; Statement of Michael
Shepley, Jan. 19, 2012 (doc. no. 59-12) ("Shepley Statement"),
at 1.  Ruiter then entered his cell and the cell door closed
behind him.  See Shepley Statement, at 1.  After Ruiter was
secure in his cell, Shepley escorted Beaulieu to her cell and
radioed the control room to secure the door to that cell.  Id.;

Aff. of Michael Shepley, Dec. 17, 2015 (doc. no. 88-1) ("Shepley
Aff."), at para. 6.  Once the door to Beaulieu's cell closed,
she backed up to the "cuff slot" and Shepley removed her
handcuffs.  Id.  Shepley then walked off the tier and, as he did
so, he radioed the control room to release Ruiter, so he could
continue his cleaning work.  Id.

At some point thereafter, Ruiter entered Beaulieu's cell
twice.  See Defs.' Mem. of Law (doc. no. 59-1), at 16.  After
leaving Beaulieu's cell for the second time, see id., Ruiter
approached the end of the tier, signaled the control room
officers, and told them that the door to Beaulieu's cell was
open.  The control room officers then secured Beaulieu's door.
See Washburn Statement; Whitney Statement.

Shepley has specifically denied knowing either that Ruiter
had entered Beaulieu's cell on January 19, 2012, or that
Beaulieu's cell door had become unsecured at any time after
Shepley put her in the cell and called for the door to be closed
and secured.  Shepley Aff. at paras. 4, 7.  Moreover, says
Shepley, Beaulieu never signaled to him that the door was
unsecured; that if Beaulieu had done so, Shepley would have
radioed the control room to have the door locked; and that

Shepley never noticed anything wrong while he was on the tier.
Id. at paras. 6-7.  Beaulieu questions Shepley's statements and,
in her declaration, she says she believes Shepley knew her cell
door was unlocked.  She bases that inference on her claim to
have seen Shepley smile as he walked by the tier with another
inmate, and her claim that Shepley did not check to make sure
her cell door was secured before walking away with that inmate.
Beaulieu Decl. at 1; see also Statement of Christopher Beaulieu,
Jan. 19, 2012 (doc. no. 59-15) ("Beaulieu Statement"), at 6.

Several hours later, during the second shift, CO David
Miville noticed bruises on Beaulieu's face.  Statement of David
Miville, Jan. 19, 2012 (doc. no. 59-20), at 9.  Investigators
later determined that, at some point on January 19, 2012, during
the first shift, Ruiter had entered Beaulieu's cell and hit her.
See id.; Beaulieu Statement (doc. no. 59-15) at 5.  Ruiter was
written up for assault and, after a hearing, was found guilty of
the lesser offense of being "out of place."  Disciplinary
Hearing Results, Feb. 19, 2012 (doc. no. 59-20), at 13; Beaulieu
Aff. #1, at para. 3.

Each of the control room officers has filed an affidavit
stating that he would not have purposefully opened Beaulieu's

cell door while another inmate was out on the tier.  Aff. of
Kevin Washburn, Dec. 9, 2015 (doc. no. 59-9) ("Washburn Aff."),
at para. 7; Whitney Aff. at para. 8.  Washburn has stated that
he does not recall opening Beaulieu's cell when Ruiter was on
the tier but that, if it somehow happened, it was accidental.
Washburn Aff. at para. 7; Washburn Statement (doc. no. 59-10).
Whitney also states that, if Beaulieu's door became unsecured,
it would have been accidental.  Whitney Aff. at para. 8.  Both
officers state that they did not know Ruiter had entered
Beaulieu's cell while they were in the control room, and that
they were unaware an assault had occurred at that time.
Washburn Aff. para. 4, at 2; Whitney Aff. para. 4, at 2.

III. August 2013 Incident

On August 16, 2013, Beaulieu was housed in the NHSP Secure
Psychiatric Unit.  On that date, Corrections Officers Edward
Kirrane and Aaron Belanger were escorting Beaulieu back to her
cell after an appointment.  Aff. of Edward Kirrane, Dec. 15,
2015 (doc. no. 59-2) ("Kirrane Aff."), at para. 4; Aff. of Aaron
Belanger, Dec. 4, 2015 (doc. no. 59-4) ("Belanger Aff."), at
para. 4.  In their sworn declarations, Kirrane and Belanger
state that Beaulieu appeared agitated during the escort.  Once
the officers arrived at Beaulieu's cell, Kirrane released the

buckle on the leather "belly belt" attached to Beaulieu's handcuffs.  According to the officers, before they could close the door, Beaulieu turned quickly, while still handcuffed, and swung the leather belt and metal buckle toward Kirrane.  Kirrane Aff., at para. 4; Belanger Aff., at para. 4.  While Beaulieu does not specifically dispute that she swung the belt toward the officers, she previously described that act as inadvertent, stating in an (unsworn) Inmate Request Slip ("IRS") that the officers "had the door closed most [of] the way when I slipped and hit the window [with] the buckle."  IRS, Aug. 17, 2014 (doc. no. 59-21), at 1.  But, regardless of Beaulieu's subjective intent, both officers perceived that her conduct was intentional.

Belanger and Kirrane then went into the cell to retrieve the belt and took Beaulieu to the floor.  Kirrane Aff., at para. 4; Belanger Aff., at para. 4.  According to the officers, Beaulieu became "resistive" and disobeyed their orders.  While Beaulieu generally denies resisting, it is undisputed that during the struggle for the belt, she attempted to pull the handcuffs beneath her body.  Kirrane Aff., at para. 4; Belanger Aff., at para. 4.  And, at some point during the struggle with Beaulieu, Officer Belanger injured his shoulder.  Belanger Aff.

at para. 5.  In an effort to secure Beaulieu's compliance and to stop her resistance, Belanger delivered a "knee strike" to Beaulieu's left leg, while Beaulieu was on the floor.  Kirrane Aff., at para. 4; Belanger Aff., at para. 4.  Once the officers regained control of Beaulieu, they took back the belt, brought Beaulieu to the cell door, and removed her handcuffs through the tray slot.  Both officers join in saying that they used no more force against Beaulieu than was reasonably necessary to regain possession of the belt, after she had attempted to strike Kirrane with it.  And, say the officers, they used that modest amount of force without malicious or sadistic intent.  Kirrane Aff., at para. 5; Belanger Aff., at para. 6.[3]

For her part, Beaulieu does not offer a specific account of the events in question.  Rather, she generally denies the accuracy of defendants' version of the relevant events surrounding the August 2013 incident.  Second Aff. of Christopher (Crystal) Beaulieu, Aug. 2, 2016 (doc. no. 87-7)

---

[3]     A video filed with the motion for summary judgment shows two officers walking with Beaulieu to a cell, while Beaulieu is handcuffed in front of her body.  The two officers stand outside the partially closed cell door, while Beaulieu is in the cell.  The officers then quickly step into the cell and remain out of view of the camera for less than two minutes.  The two officers then back out of the cell, into the corridor, close the cell door, and appear to remove Beaulieu's handcuffs through the door's tray slot.  See Video, SPU Infirmary Camera, Aug. 16, 2013.

("Beaulieu Aff. #2") at para. 11.  She also generally denies
offering any resistance during the incident - again, without
providing any specific facts or details to rebut defendants'
version.  Id., at para. 8.  Beaulieu also says the officers
weighed more than she did; they called her a "rat bitch" during
the incident; and Kirrane prevented her from blocking Belanger's
knee strike.  Id., at paras. 8-9.


     Following the incident, Beaulieu received medical
attention, but only complained of wrist pain.  Statement of
Aaron Belanger, Aug. 16, 2013 (doc. no. 59-5).  She appears not
to have complained of pain in, or injury to, her leg where
Belanger delivered the knee strike.  Beaulieu was later found
guilty of the disciplinary offense of "throwing or propelling an
object or substance at another person or which may cause
property damage."  DOC Disciplinary Log Search (doc. no. 87-9);
Beaulieu Aff. #2, at para. 2.


IV.  March 2014 Incidents

     Finally, Beaulieu alleges that, while she was an inmate in
the Secure Psychiatric Unit in March 2014, inmate Scott Collier
harassed her and assaulted her by spraying her with a firehose.
Beaulieu sent an Inmate Request Slip to SPU Capt. Paul Cascio,

and then filed grievances with the SPU Director and the
Commissioner's Office, in which she complained about a number of
things, including that Collier had sprayed her with a hose.
Beaulieu also complained that Collier had acquired information
about her criminal charges – a sexual assault – as well as the
name of Beaulieu's boyfriend, which Collier had used to mock or
harass her.  See Defs.' Mem. of Law (doc. no. 59-1), at 8-10.

V.   Beaulieu's Claims[4]

The court has identified Beaulieu's federal claims, which
she advances pursuant to 42 U.S.C. § 1983, as follows:

> Count I:  On January 19, 2012, CO Michael Shepley, in
> violation of Beaulieu's Eighth Amendment rights,
> allowed inmate Rueben Ruiter access to Beaulieu's cell
> and did not prevent Ruiter's ensuing assault of
> Beaulieu, despite Shepley's knowledge that Ruiter had
> been encouraged to attack Beaulieu and that Ruiter
> presented a substantial risk of serious harm to
> Beaulieu.
>
> Count II:  Chef Paul Laflamme, CO Jason Whitney, and
> CO Kevin Washburn, who were in the SHU control room
> when inmate Rueben Ruiter attacked Beaulieu on January
> 19, 2012, each acted with deliberate indifference to a
> substantial risk of serious harm to Beaulieu, in
> violation of her Eighth Amendment rights: (a) by
> allowing Beaulieu's cell door to be open at a time

---

[4]    The claims here were identified in the magistrate
judge's June 10, 2015, Report and Recommendation (doc. no. 31),
which was approved on July 2, 2015.  See Order (doc. no. 37).
The claims have been rearranged and renumbered chronologically
for the purposes of this Order.

when Ruiter was on the tier and had access to
Beaulieu's cell; and/or (b) by allowing Laflamme
unauthorized access to the SHU control room and
engaging in a social conversation with him, which
caused the officers to fail to adequately monitor
Beaulieu's cell while Ruiter was working on the tier.

Count III:  On August 16, 2013, CO Edward Kirrane and
CO Aaron Belanger used excessive force against
Beaulieu, in violation of Beaulieu's Eighth Amendment
rights.

Count IV:  CO John Aulis and CO Dominic Salce
disclosed unspecified "security information," as well
as Beaulieu's sex offender status, to inmate Scott
Collier, and then failed to prevent Collier from
harassing and assaulting Beaulieu with a fire hose.[5]

## Discussion

### I.   Exhaustion

As to at least one of Beaulieu's claims, defendants assert

that she failed to properly exhaust available prison

administrative remedies prior to filing suit.  See generally

42 U.S.C. § 1997e(a) ("No action shall be brought with respect

to prison conditions under section 1983 of this title, or any

other Federal law, by a prisoner confined in any jail, prison,

or other correctional facility until such administrative

remedies as are available are exhausted.").  But, because the

court concludes that there are no genuinely disputed material

---

[5]   As noted above, Beaulieu also advances state common
law tort claims for assault and battery against inmates Ruiter
and Collier.  Those tort claims are not addressed in this Order.

facts and Beaulieu's claims can be resolved on the merits, it
need not address the exhaustion issue.


II.   The Eighth Amendment and Failure to Protect an Inmate

In Counts I and II of her complaint, Beaulieu claims that
Shepley, Whitney, Washburn, and Laflamme violated her
constitutional rights by failing to protect her from Ruiter's
assault on January 19, 2012.  Defendants contend that Beaulieu
has not shown that there is any material triable issue of fact
with respect to the merits of those claims.


     A.   Governing Law

Under the Eighth Amendment, "[p]rison officials have a duty
to . . . take reasonable measures to guarantee the safety of
the[ir] inmates."  Giroux v. Somerset Cty., 178 F.3d 28, 31 (1st
Cir. 1999) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994))
(internal quotation marks omitted).  Among other things, "prison
officials have a duty . . . to protect prisoners from violence
at the hands of other prisoners."  Giroux, 178 F.3d at 32
(quoting Farmer, 511 U.S. at 833).  Failure to honor those
obligations may amount to a violation of the Eighth Amendment.

But, "a prison official violates the Eighth Amendment only when two requirements are met," Farmer, 511 U.S. at 834, one of which is "objective" while the other is "subjective."  To prevail on her Eighth Amendment claim that prison officials failed to protect her from Ruiter's assault, Beaulieu must first show that, objectively, she was "incarcerated under conditions posing a substantial risk of serious harm."  Id.  Second, as to the subjective prong of an Eighth Amendment claim, she "must show that prison officials possessed a sufficiently culpable state of mind, namely one of 'deliberate indifference' to [her] health or safety."  Burrell v. Hampshire Cty., 307 F.3d 1, 8 (1st Cir. 2002) (citation omitted).  A prison official acts with deliberate indifference when he or she "knows of and disregards an excessive risk to inmate health or safety."  Farmer, 511 U.S. at 837.  Knowledge of such a risk exists when a prison official is "both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also draw[s] the inference."  Id.  Plainly, then, "deliberate indifference entails something more than mere negligence."  Id. at 835.

B.   Shepley (Count I)

Defendants do not dispute that Shepley knew that Beaulieu was afraid of Ruiter.  Nor do they contend that it was unusual or unreasonable for Beaulieu to ask that Ruiter be confined to his cell while Beaulieu was out of her cell.  But, it is also undisputed that after Shepley placed Beaulieu in her cell (and before leaving the tier and radioing for Ruiter's release), Shepley contacted the control room and asked that the door to her cell be secured.  There is no submission of evidentiary quality disputing Shepley's affidavit, which states that he did not know that Beaulieu's door was unlocked after he radioed for it to be secured.  And, nothing in the record provides a basis for a reasonable jury to find that Shepley was deliberately indifferent to the risk that Beaulieu's cell door might be unsecured while Ruiter was out on the tier.  Indeed, on this record, a jury could not reasonably conclude that he was even negligent.  Accordingly, defendants' motion for summary judgment on Count I is granted.


C.   Whitney and Washburn (Count II)

Beaulieu claims that Officers Whitney and Washburn are liable for failing to ensure that her cell door was secure while Ruiter was outside his cell, on the tier.  The evidence is

15

undisputed, however, that neither officer knew that Beaulieu's door was unlocked during the relevant time period (that is, until Ruiter signaled to them, sometime after he left Beaulieu's cell).  Because Beaulieu has failed to identify any triable issue of fact as to Whitney's and Washburn's lack of subjective knowledge that her cell door was unlocked, those defendants are entitled to summary judgment on the Eighth Amendment claims. Accordingly, defendants' motion for summary judgment is granted on those claims in Count II asserted against Whitney and Washburn.

D.    Laflamme (Count II)

Laflamme is also entitled to summary judgment on Count II. The allegedly wrongful (and unconstitutional) conduct underlying the claims in Count II consists of defendants having allegedly: (1) allowed Beaulieu's cell door to be open when Ruiter was on the tier; and (2) allowed a third party (Laflamme) to be in the SHU control room during inmate movements.  But, it is undisputed that Whitney and Washburn, not Laflamme, were operating the SHU control room panels when Ruiter assaulted Beaulieu.  And, Laflamme's mere act of socializing with those officers during cell movements that those officers were responsible for monitoring, falls well short of knowing about and consciously

16

disregarding an excessive risk to Beaulieu's health and safety.
Stated somewhat differently, the record in no way supports even
an inference that Laflamme was deliberately indifferent to
Beaulieu's safety and welfare during the events in question, or
that he played any role at all in bringing about any harm to
her.

As Beaulieu has not met her burden to demonstrate the
existence of a triable issue as to that claim, Laflamme is
entitled to judgment as a matter of law on Count II.

III. <u>The Eighth Amendment and Excessive Force</u>

    A.   <u>Governing Law</u>

"The Constitution does not mandate comfortable prisons, but
neither does it permit inhumane ones, and it is now settled that
the treatment a prisoner receives in prison and the conditions
under which he is confined are subject to scrutiny under the
Eighth Amendment." <u>Farmer</u>, 511 U.S. at 832 (citations and
internal punctuation omitted).  But, "[t]hat is not to say that
every malevolent touch by a prison guard gives rise to a federal
cause of action.  The Eighth Amendment's prohibition of 'cruel
and unusual' punishment necessarily excludes from constitutional
recognition <u>de minimis</u> uses of physical force, provided that the

use of force is not of a sort repugnant to the conscience of
mankind." Hudson v. McMillian, 503 U.S. 1, 9-10 (1992) (citing
Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973) ("Not every
push or shove, even if it may later seem unnecessary in the
peace of a judge's chambers, violates a prisoner's
constitutional rights")).  Rather, the Eighth Amendment's
prohibition against cruel and unusual punishment forbids "the
unnecessary and wanton infliction of pain." Hudson, 503 U.S. at
5 (internal quotation marks and citation omitted).

          B.   Claims Against Kirrane and Belanger

     In Count III, Beaulieu claims that Kirrane and Belanger
used excessive force against her when, on August 16, 2013, they
restrained and kneed her in an effort to subdue her and retrieve
the belt she had swung at them.  That conduct, says Beaulieu,
violated her rights under the Eighth Amendment.

     The core inquiry presented by Beaulieu's claim is whether
Kirrane and Belanger employed force against Beaulieu "in a good-
faith effort to maintain or restore discipline" or whether they
acted "maliciously and sadistically to cause harm." Hudson, 503
U.S. at 7 (citing Whitley v. Albers, 475 U.S. 312, 320-21
(1986)).  Relevant factors to that inquiry include: (1) the

threat reasonably perceived by the responsible officials; (2) whether the use of force "could plausibly have been thought necessary"; (3) the relationship between the need for force and the amount of force actually employed; (4) any efforts made to temper the severity of a forceful response; and, finally, (5) the nature and extent of Beaulieu's injuries.  Hudson, 503 U.S. at 7.

Here, both officers have stated that, because Beaulieu was in an agitated state and because she swung the belt buckle at them, they perceived her possession of the belt to be a threat. They also join in asserting that she resisted their efforts to retrieve the belt and, while she was on the floor, attempted to draw her handcuffed hands under her body.  Beaulieu's general and conclusory assertion that she "was in no way resisting," Beaulieu Aff. (doc. no. 87-7) at para. 8, is insufficient to create a genuinely disputed triable issue of fact.  See generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Serapion v. Martinez, 119 F.3d 982, 987 (1st Cir. 1997). Whether Beaulieu was resisting or whether she was compliant is a conclusion that must be drawn based upon all of the facts attendant to the events in question.  And, Beaulieu's affidavits are devoid of any factual assertions that contradict (or even

undermine) the officers' claim that, rather than cooperatively returning the belt in question, Beaulieu forced them to wrestle it from her as she struggled on the floor of her cell.

Given the undisputed facts of record, each of the factors identified in Hudson persuasively points to the conclusion that the use of force against Beaulieu, as well as the quantum of force applied, were reasonable.  Under the circumstances, the officers plainly could have thought the use of some force was necessary to retrieve the belt from (an uncooperative and agitated) Beaulieu.  The threat reasonably posed by Beaulieu's possession (and swinging) of the belt was both real and substantial.  There is no indication that the officers used a disproportionate amount of force in order to recover the belt – indeed, the entire incident lasted less than two minutes and Beaulieu does not claim the officers continued to use force against her once she relinquished control of the belt.  On that point, the evidence is undisputed: once the officers recovered the belt, the struggle with Beaulieu ended, they lifted her off the floor, and they escorted her to the cell door, so they could remove her handcuffs through the tray slot.  And, finally, the nature and extent of Beaulieu's injuries – complaints of a sore wrist and no documented injuries related to the "knee strike" to

her thigh – strongly suggest that the amount of force employed by the officers was no more than de minimis. Under the circumstances presented, a knee strike to Beaulieu's thigh that produces no resulting injury and no contemporaneous medical complaint from the prisoner, is not the sort of force that is "repugnant to the conscience of mankind." Hudson, 503 U.S. at 10.

On this record, then, Beaulieu has simply failed to identify any trial-worthy issues of disputed fact. The force employed by the officers against Beaulieu in an effort to recover the belt was, under the circumstances, reasonable and measured and it served a legitimate penological purpose; nothing in the record would support the conclusion that the officers were acting "maliciously and sadistically to cause harm," Hudson, 503 U.S. at 7, or that they engaged in "the unnecessary and wanton infliction of pain," Whitley 475 U.S. at 319. Consequently, as a matter of law, the force used against Beaulieu in order to recover the belt was not violative of the Eighth Amendment. Defendants are, therefore, entitled to summary judgment as to Beaulieu's excessive force claim.

IV.   <u>Count IV - Leaked Inmate Information and Failure to Protect</u>

Finally, in Count IV of her complaint, Beaulieu claims that CO John Aulis and CO Dominic Salce violated her rights under the Eighth Amendment by disclosing "security information" about her to inmate Collier, which proximately caused Collier to harass and assault her.  And, says Beaulieu, after providing Collier with the information that inspired his harassing and assaultive behavior, those officers then failed to prevent or protect her from that behavior.

Even assuming that Collier's harassment and spraying of Beaulieu with the hose inflicted upon her the type of "sufficiently serious" injury(s) that might give rise to a viable Eighth Amendment failure-to-protect claim, <u>see generally Farmer</u>, 511 U.S. at 834, it is undisputed that Aulis neither prompted Collier to harass Beaulieu, nor failed to protect Beaulieu from him.  In his affidavit, Aulis stated - without contradiction - that he never disclosed any information about Beaulieu's sex-offender status or any other "security information" about Beaulieu to Collier.  <u>See</u> Aff. of John Aulis, Dec. 9, 2015 (doc. no. 59-13) ("Aulis Aff.") at para. 2.  It is also undisputed that Aulis was unaware that Collier had harassed or assaulted Beaulieu, or that Collier posed a threat to her.

22

See id.  Because no reasonable jury could find in favor of Beaulieu on the factual predicates for her Eighth Amendment claim against CO Aulis, he is entitled to judgment as a matter of law on that part of Count IV.

It is also undisputed that CO Salce: (1) never disclosed any information about Beaulieu's sex-offender status or other "security information" about her to Collier, see Aff. of Dominic Salce, Dec. 17, 2015 (doc. no. 88-2) at para. 2; and (2) was unaware that Collier had ever harassed or assaulted Beaulieu, see id.[6]  Again, Beaulieu has failed to show that there are any triable issues on the factual predicates to her claims. Accordingly, CO Dominic Salce is also entitled to judgment as a matter of law on the merits of the Eighth Amendment claims in Count IV.

### Conclusion

For the foregoing reasons, the eight named corrections officers are entitled to judgment as a matter of law on all

---

[6]      The affidavit of Dominic Salce, document no. 88-2, appears to have been executed before Tara L. Whiting, on December 17, 2015, five years after the expiration of her commission as a Justice of the Peace/Notary Public. Nevertheless, that document also includes the declaration required by 28 U.S.C. § 1746.  The court has, therefore, accepted that document as equivalent to a properly executed affidavit.

claims advanced against them in Beaulieu's complaint.  Their motion for summary judgment (doc. no. 59) is, therefore, granted.

Beaulieu's claims against inmates Collier and Ruiter are unaffected by this Order.  Further proceedings on those claims will be addressed in a separate Order.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

September 28, 2016

cc:  Christopher (Crystal) Beaulieu, pro se
     Laura E.B. Lombardi, Esq.